D/F

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------X

JOSEPH E. DeSTEFANO,

      Plaintiff,

                                    **MEMORANDUM & ORDER**
v.                                **05-CV-3534 (NGG)**

MICHAEL J. ASTRUE,
Commissioner of Social Security[1],

      Defendant.
-----------------------------------------------------------X

GARAUFIS, United States District Judge.

      Joseph E. DeStefano ("Plaintiff") brings this action pursuant to 42 U.S.C. §§ 405(g) and

1383(c)(3) challenging the final determination of the Commissioner of Social Security

("Commissioner") denying Plaintiff's application for Social Security disability benefits.

Plaintiff contends that the Administrative Law Judge ("ALJ") who denied his application

erroneously determined that Plaintiff's impairment was not equivalent to an impairment listed in

Appendix 1 of 20 C.F.R. Pt. 404 Subpt. P. Plaintiff further maintains that the ALJ failed to

support with substantial evidence his finding that Plaintiff could perform sedentary or light work.

      Before the court are the parties' cross-motions for judgment on the pleadings. For the

reasons set forth below, the Commissioner's motion is DENIED, Plaintiff's motion is

GRANTED, and this case is remanded to the Social Security Administration for calculation of

benefits only.

---

[1] Pursuant to Fed. R. Civ. P. 25(d)(1), Michael J. Astrue is substituted for Jo Anne B.
Barnhart as the defendant in this action.

## I.   Background

### A. Procedural History

Plaintiff filed an application for Social Security disability benefits on November 15, 1994. (Transcript of the Record ("Tr.") at 25.) His application requested benefits for the period from October 30, 1992, when he retired from the New York City Police Department ("NYPD"), through December 31, 1997, when his social security eligibility expired (the "relevant period"). (Id. at 26.) ALJ Kenneth Levin held a hearing on May 29, 1996 and issued an opinion on June 3, 1996 denying Plaintiff's application. (Id. at 57-64.) Plaintiff appealed that decision to the Social Security Administration Appeals Council ("Appeals Council") on June 10, 1996. (Id. at 66.) On March 3, 2000, the Appeals Council sent notice to Plaintiff indicating that it would be unable to review ALJ Levin's decision because the file had been lost and that Plaintiff's case would therefore be remanded for a second hearing. (Id. at 84.) This second hearing took place on April 18, 2001 before ALJ Marilyn P. Hoppenfeld. (Id. at 208.) ALJ Hoppenfeld's opinion, dated March 28, 2003, also denied Plaintiff's application for benefits. (Id. at 22.) On May 9, 2003 Plaintiff appealed that decision to the Social Security Administration Appeals Council. (Id. at 8.) The Appeals Council denied the appeal. (Id. at 2.) Plaintiff timely filed this complaint on July 28, 2005. 42 U.S.C. § 405(g) (providing that an action must be commenced within sixty days of, or such time as the Commissioner may allow after, receiving notice of an unfavorable decision).

## B. Plaintiff's Personal and Employment History

Plaintiff was born on May 13, 1944. (Id. at 116.) According to his testimony, he received a B.A. in political science from Iona College in New Rochelle in 1965 and then attended the New York City Police Academy. (Id. at 215.) He became an NYPD officer in 1968 and was promoted to sergeant in 1979. (Id. at 219.) On March 21, 1991, he suffered an on-duty injury and thereafter was confined to restricted duty by the chief orthopedic police doctor. (Id. at 221.) His new job kept him in an office at all times and consisted of supervising detectives who were assigned to computer-tracking of narcotics offenders; in particular, Plaintiff kept attendance records, maintained office discipline, and ensured that detectives used computer software for authorized purposes only. (Id. at 242-43.) As a result of his restricted duty status, according to Plaintiff, he never received his scheduled promotion to lieutenant and retired as a sergeant in 1992. (Id. at 220.)

## C. Plaintiff's Medical History

When Plaintiff was injured, he was on-duty with the NYPD as a supervisor in the narcotics division. (Id. at 151, 221.) At the time, he was performing a joint operation with the United States Customs Division to raid a freighter tanker, which required climbing onto the tanker from a police harbor boat. (Id. at 222-23.) During Plaintiff's climb, a wave rocked the two boats and Plaintiff was thrown backwards into the air, landing on a metal plate on the harbor boat. (Id. at 224.) Another officer reached out in time to prevent Plaintiff's head from hitting the metal plate. (Id.) Plaintiff experienced sharp pain in his back upon his fall. (Id.)

Plaintiff reported his injury to the NYPD as soon as the raid was complete and then tried to go home, thinking initially that he had suffered only a minor strain. (Id. at 225.) He returned

3

to work a few hours later in pain and was taken by other officers to the Lutheran Medical Center in Brooklyn, where an X-ray was taken and he was examined and released. (Id.) The following day, Plaintiff saw Dr. Fenster, an NYPD doctor, who examined him and advised him to take one month off of work and then report back on his condition. (Id. at 227-28.) By the end of the month, Plaintiff's pain had worsened and Dr. Fenster authorized him to see an orthopedic surgeon. (Id. at 229.)

In May 1991, Plaintiff saw orthopedist Dr. Francis J. Lanzone. (Id. at 148.) Dr. Lanzone found that Plaintiff was experiencing "pain in the center of his back" and "numbness in his right leg," was "unable to extend his legs without pain," and had a "positive straight leg raising" test. (Id.) While Dr. Lanzone also reported a normal neurologic examination and no sensory deficit, he nonetheless ordered a Magnetic Resonance Imaging exam ("MRI") and prescribed physical therapy. (Id.) On April 26, 1991, Plaintiff underwent an MRI of his spine at Long Island NMR. (Id. at 104.) The treating radiologist, Dr. A. Steven Charney, reported that the MRI indicated "a laterally bulging disc to the right with extension into the right neuroforamen with some encroachment upon the exiting nerve root." (Id.)

Between August and November of 1991, Plaintiff underwent three rounds of physical therapy with therapist John Pawlowski. (Id. at 127-129.) Over the course of the treatment, Plaintiff's isometric lift strength from the floor improved from 112 pounds to 134 pounds with some "noted improvements reported in flexibility and strength" and reduced pain during mobility testing. (Id. at 129.) Pawlowski reported that Plaintiff's subjective complaints of pain during his daily activities remained stable, his right straight leg raising test did not improve at all, and his left straight leg raising ability declined. (Id.)

4

In December 1991, Dr. Lanzone reported in a letter to the NYPD Medical Board ("Board") that Plaintiff had not shown any improvement and could "no longer perform police work," referencing both his own examinations of Plaintiff and Plaintiff's April 1991 MRI. (Id. at 131-32.) Dr. Lanzone also noted that Plaintiff's condition might warrant surgery if the pain were to worsen, but that Plaintiff instead preferred to pursue a "conservative" approach to his treatment. (Id. at 132.)

In May 1992, Plaintiff was examined by the Board. (Id. at 144-45.) The Board's report recommended denying Plaintiff's application for disability retirement, noting that "the objective findings on this examination taken together with supporting documentation do not substantiate a disability that would prevent the return of this officer to full duty[.]" (Id. at 145.) The Board acknowledged that it had reviewed Plaintiff's prior medical records and reports from Drs. Kaplan and Lanzone as well as Plaintiff's x-rays and MRIs. The Board noted that Plaintiff's complaints were of low back pain "which is aggravated by sitting for twenty minutes and prevents him from running or jumping," pain going down stairs, and "numbness on the lateral aspect of the right thigh." (Id.) On physical examination, the Board noted that Plaintiff performed heel walking and toe walking, but that he did so in a "slow[,] deliberate[,] apprehensive appearing manner." (Id.) The Board also noted that Plaintiff felt "tenderness when minimal skin pinch was applied over the skin of the lumbar paraspinal area," that he complained of back pain on straight leg raising in the seated and supine positions, and that he demonstrated restricted range of motion. (Id.) Plaintiff also performed "a near complete deep knee bend," had "deep tendon reflexes [that] were active and symmetrical throughout both lower extremities," and exhibited "no evidence of thigh or calf muscle atrophy." (Id.)

5

On June 23, 1992, Plaintiff visited a second orthopedist, Dr. Irving Mauer. (Id. at 135.) Dr. Mauer reported positive straight leg raising (consistent with the other reports) and found that Plaintiff was unable to walk on his heels and experienced a mild dropping of his right foot when he attempted to do so. (Id.) Dr. Mauer reviewed Plaintiff's MRI as well as an X-ray of his spine, which Dr. Mauer found to show degenerative osteophytosis. (Id.) He found Plaintiff unable to return to full-duty police work, but did not comment at that time about Plaintiff's capacity for other types of employment. (Id. at 135-36.)

In October 1992, Plaintiff visited Dr. Lanzone again and Dr. Lanzone sent the NYPD an addendum to his December 1991 letter. (Id. at 133.) In that addendum, Dr. Lanzone reported that Plaintiff demonstrated "positive contro-lateral cross legged stress testing," which was "pathognomonic for a disc herniation." (Id.) He also continued to find positive straight leg raising on the right side, numbness in Plaintiff's right leg, weakness in his right foot, and "mild dropping of his right foot on strength testing." (Id.) Dr. Lanzone further noted that Plaintiff reported "severe paravertebral muscle spasm, causing him debilitating pain [and] making him unable to get up from a supine position for many hours." (Id.)

In April 1993, Plaintiff saw a third orthopedist, Dr. Murray E. Burton. (Id. at 100.) Dr. Burton reviewed the findings of Drs. Mauer and Lanzone and the Board. (Id.) He also looked at Plaintiff's MRI and X-ray reports and had the MRI reinterpreted by Dr. Hossein Firooznia. (Id. at 101.) According to Dr. Burton, Dr. Firooznia found disc herniation rather than merely disc bulge. (Id.) Dr. Burton acknowledged that the X-ray showed "no fracture and no evidence of any major malalignment." (Id. at 102.) Upon examination of the patient, Dr. Burton noted that Plaintiff had difficulty rising on the heel of his right foot, performed a deep knee bend poorly,

and had limited mobility. (Id. at 101.) Dr. Burton concluded that "[t]he patient is unable to perform any rigorous work, and in my opinion is even unable to perform light work at this time. Prognosis for any further recovery is, in my opinion, extremely guarded." (Id. at 102.)

On May 14, 1993, Plaintiff had additional studies of his right hand and lumbar spine performed by Dr. Ronald Holzman. (Id. at 114.) Dr. Holzman found "no evidence of any fracture . . . or other abnormality" in Plaintiff's hand, but found that the lumbar spine showed "straightening of the normal lordotic curve . . . consistent with a degree of muscle spasm." (Id.)

In June 1995, Dr. Lanzone reported, by letter, Plaintiff's condition to the New York State Department of Social Services. (Id. at 151.) In this letter, Dr. Lanzone referenced his prior examinations of Plaintiff, the 1991 MRI, and Plaintiff's then-current condition. (Id.) It was his conclusion that Plaintiff was "unable to obtain any gainful employment," noting in particular Plaintiff's back spasms and his inability to sit or stand for any length of time continuously, lift heavy objects, or walk up and down stairs. (Id.) This opinion was affirmed by Dr. Burton, following his reexamination of Plaintiff on April 17, 1996. (Id. at 106-07.) Dr. Burton reported that the patient was experiencing ongoing back and leg pain; sciatica; numbness in the legs and feet; difficulty in flexion, bending, and straight leg raising; and severe pain from arthritis and "trigger finger" in his hands. (Id. at 106.) Dr. Burton wrote, "It is my opinion that this patient is unable to perform any form of gainful employment. This is permanent." (Id. at 107.)

Plaintiff's further evaluations consisted of having images taken of his right foot and left knee by Dr. R. Lichtsztral on December 11, 1996. (Id. at 112-13.) Dr. Lichtsztral wrote that Plaintiff's right foot "shows evidence of plantar and posterior calcaneal spurs. There are also degenerative changes involving first metatarsal phalangeal joint and second with joint narrowing

7

and some deformity, more severe at the level of the second metatarsal joint." (Id. at 112.) The metatarsal phalangeal joints are the joints that connect the toes to the forefoot at the ball of the foot. (Id.) Dr. Lichtsztral noted only minor changes in Plaintiff's left kneecap. (Id. at 113.)

On January 14, 1997, Plaintiff had an MRI of his left knee taken by Dr. Mark D. Novick. (Id. at 109.) Dr. Novick found a "1 cm zone of osteonecrosis" with "no joint effusion, dissecting popliteal cyst, or other soft tissue abnormalities." (Id.) On March 6, 1997, Dr. L. Diwan also reported that this MRI demonstrated "osteonecrosis with degenerative arthritis" and noted that Plaintiff had been informed of his condition and his various treatment options, including surgery, which he was told might help but was not guaranteed to lead to improvement. (Id. at 111.)

Plaintiff next had his right knee evaluated, beginning with an X-ray taken on August 11, 1998 by Dr. S. M. Weiser, who found that "[m]ild osteoarthritic changes are present" and recommended further sonogram imaging to determine whether or not there was a Baker's cyst present. (Id. at 143.) Plaintiff underwent the recommended follow-up on September 24, 1998 with Dr. I. Ismailer. (Id. at 108.) Dr. Ismailer found "no sonographically demonstrable evidence of a Baker's cyst" but did find "suggestion of minimal knee effusion." (Id.)

Although Plaintiff ultimately did not seek treatment beyond over-the-counter pain medications, rest, and exercise, his primary treating physician, Dr. Lanzone, expressed again in an unaddressed letter dated March 15, 2001 that Plaintiff was unable to work at all due to the conditions and limitations described above. (Id. at 98-99.)

*D. Non-Medical Evidence*

At an administrative hearing held on April 18, 2001, Plaintiff explained that during the relevant period, he spent most of his time either at home or at a park located one and a half

blocks from his home, to which he walked. (Id. at 256.) He further stated that he often would lie on his side while at home reading or watching television and that while at the park, he alternated between sitting, standing, and lying down on a park bench. (Id.) About once per month, he traveled with his family to their home in Margarettville, New York, which is a three-hour ride from his home in New York City. (Id. at 258-59.) He testified that he did not drive during these trips, that he stopped frequently at rest stops along the way, and that once in Magarettville, he remained mostly housebound. (Id.)

Plaintiff also testified that he could not walk more than two blocks without having to rest and could not stand or sit continuously for more than fifteen minutes without pain. (Id. at 252.) He further stated that he could not bend or lift at all without experiencing severe back spasms. (Id.) Plaintiff described these spasms, which caused him to feel as if he were being stabbed in the back, as radiating pain that left him functionally paralyzed, forced to lie down, and lasted approximately fifteen to twenty minutes before slowly dissipating. (Id. at 253.)

## II. Discussion

### A. Standard of Review

A district court may set aside the Commissioner's determination that a claimant is not disabled only if the Commissioner's factual findings are not supported by substantial evidence or the Commissioner's decision is based on legal error. 42 U.S.C. § 405(g); Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000). A reviewing court must verify that a claimant had a "full hearing under the Secretary's regulations and in accordance with the beneficent purposes of the Act." Cruz v. Sullivan, 912 F.2d 8, 10 (2d Cir. 1990) (quoting Gold v. Sec'y of Health, Educ. and Welfare, 463 F.2d 38, 43 (2d Cir. 1972)).

*B. The ALJ's Decision*

To receive benefits. a claimant must be "disabled" within the meaning of the Social

Security Act. Shaw, 221 F.3d at 131. Agency rules require the Commissioner to apply a five-

step sequential analysis to evaluate whether a claimant is disabled. 20 C.F.R. § 404.1520. Those

five steps are:

1.   The Commissioner considers whether the claimant is currently engaged in
     substantial gainful activity.

2.   If the claimant is not engaged in substantial gainful activity, the
     Commissioner considers whether the claimant has a "severe impairment"
     which limits his or her mental or physical ability to do basic work
     activities.

3.   If the claimant has a "severe impairment," the Commissioner must decide
     whether, based solely on medical evidence. claimant has an impairment
     listed in Appendix 1 of the regulations.  If the claimant has one of those
     impairments, the Commissioner will automatically consider him disabled,
     without considering vocational factors such as age, education, and work
     experience.

4.   If the impairment is not "listed" in the regulations, the Commissioner then
     asks whether, despite the claimant's severe impairment. he or she has
     residual functional capacity to perform his or her past work.

5.   If the claimant is unable to perform his or her past work, the
     Commissioner then determines whether there is other work which the
     claimant could perform.

Shaw, 221 F.3d at 132 (citing DeChirico v. Callahan, 134 F.3d 1177, 1179-80 (2d Cir. 1998)).

The claimant has the burden of proof at the first four steps. while the Commissioner bears the

burden at the last step.  Shaw, 221 F.3d at 132. Accordingly, to create an irrebuttable

presumption of disability pursuant to the regulations, the claimant must either have a "listed

impairment" or an impairment that is "equal to" a listed impairment. 20 C.F.R. §§ 404.1520(d),

416.920(d) ("If you have an impairment(s) which . . . is listed in appendix 1 or is equal to a listed

impairment(s), we will find you disabled without considering your age, education, and work experience."); Shaw, 221 F.3d at 132.

The ALJ found that Plaintiff met the basic eligibility requirements for disability benefits through December 31, 1997, the last date of the relevant period. (Tr. at 26.) She then proceeded through the five-step analysis enumerated above, beginning with a Step 1 finding that Plaintiff had not engaged in "substantial gainful activity" during the relevant period. (Id. at 27.) The ALJ next found, at Step 2, that Plaintiff suffered from a severe impairment during that period, namely "low back derangement plantar calcaneal spurs . . . and sciatica." (Id.) At Step 3, the ALJ found that Plaintiff's impairments did not meet or equal any of the conditions listed in Appendix 1, Subpart P, Regulation No. 4. (Id.) At Step 4, the ALJ conceded that Plaintiff's condition was severe enough to prevent him from returning to his "past relevant work," which the ALJ defined as full duty police sergeant work. (Id. at 34.) At Step 5, through application of the Medical-Vocational Guidelines to Plaintiff's attributes of age, education, and work experience, in conjunction with Plaintiff's residual functional capacity to perform a full range of light work, the ALJ found that Plaintiff was not disabled. (Id. at 35.)

The ALJ acknowledged that light work requires occasionally lifting up to twenty pounds, frequently lifting and carrying up to ten pounds, and either standing and walking for large blocks of time or "sitting most of the time with some pushing and pulling of arm or leg controls." (Id. (citing 20 C.F.R. § 404.1567).) To support the finding that Plaintiff met the ability requirements for light work, the ALJ looked first to the reports of physical therapist John Pawlowski, noting Pawlowski's finding that Plaintiff could lift "approximately 30 pounds with proper bending and lifting mechanics." (Id. at 29-30.)

The ALJ then addressed Dr. Lanzone's 1992 letter, which stated that Plaintiff could not perform police work, and Dr. Lanzone's 2001 letter, which stated that Plaintiff could not perform any work at all. (Id. at 30.) The ALJ dismissed the former as inconclusive regarding the requirements of light work and the latter as being too remote in time to the relevant period. (Id. at 30-31.) The ALJ did not mention Dr. Lanzone's 1995 letter, which stated that Plaintiff was unable to perform any gainful employment and which was written in the middle of the relevant period. (Id.)

The ALJ further discounted the conclusion of Dr. Burton, expressed in 1991 and 1996, that Plaintiff was "unable to perform sustained light work" on the ground that this conclusion was reached in connection with Plaintiff's applications for disability retirement from the NYPD and Social Security Disability benefits, respectively. (Id. at 31.) The ALJ concluded that Dr. Burton's opinions were not entitled to significant weight because Dr. Burton did not have an ongoing treatment relationship with Plaintiff. (Id.) Finally, the ALJ found that Dr. Burton's findings were inconsistent with other evidence in the record, citing specifically Dr. Charney's reading of Plaintiff's 1991 MRI. (Id.)

The ALJ also considered the finding of the Board that Plaintiff was able to return to full duty police work as support for the conclusion that he was in fact able to perform light work. (Id. at 32.) In evaluating Plaintiff's own testimony, the ALJ cited Plaintiff's ability to travel with his family and read and watch television at home as evidence that he is mobile enough to perform sedentary and light work activities. (Id. at 33.)

*C. Analysis*

*1. Step 3*

Plaintiff claims that the ALJ erred at Step 3 by failing to properly obtain the necessary evidence to determine whether or not Plaintiff's condition meets or equals any impairment listed in Appendix 1. (Pl.'s Mem. Supp. Mot. J. at 14.) Plaintiff contends that his condition meets the requirements of spine disorder, which is defined as any–

> vetebrogenic disorder (e.g. herniated nucleus pulposus, spinal stenosis) with the following persisting for at least 3 months despite prescribed therapy and expecting to last 12 months. With both 1 and 2:
>
>> 1. Pain, muscle spasm, and significant limitation of motion in the spine; and
>>
>> 2. Appropriate radicular distribution of significant motion loss with muscle weakness and sensory and reflex loss.

20 C.F.R. Pt. 220, App. 1.

A court in this district has held that an ALJ did not meet the requirements of Step 3 when the ALJ relied solely on a medical expert who stated that the claimant had lupus and other impairments not explicitly listed in Appendix 1 without obtaining evidence that would actually compare the claimant's impairments to those listed in Appendix 1. Vasquez v. Barnhart, No. 02-CV-6751, 2004 U.S. Dist. LEXIS 5606, at *19-20 (E.D.N.Y. Mar. 2, 2004) (Ross, J.). The court reasoned that in order for the ALJ to have properly reached the conclusion that the claimant did not suffer from a condition that equaled any of those listed in Appendix 1, the ALJ had a duty to collect substantial evidence about all of the claimant's symptoms that allegedly corresponded to those of the listed conditions and to have compared with specificity the medical evidence to the listings. Id. at 24. The court held that an ALJ has an affirmative duty to fully

develop the record, and, at Step 3, to ensure that there is specific evidence in the record as to the relationship between the claimant's condition(s) and any similar Appendix 1 listings. Id.

In the instant case, the ALJ simply stated that Plaintiff's condition did not equal any condition listed in Appendix 1. (Tr. at 27.) She did not set forth her reasoning or consider any comparison between Plaintiff's impairments and the definition of spinal disorders, despite the overlap in symptoms. (See id.) As a result, I cannot find that the ALJ's conclusion at Step 3 rests on substantial evidence.

### 2. Step 5

Step 5 of an ALJ's analysis consists of two parts. First, the ALJ must ascertain the claimant's residual functional capacity. Second, the ALJ must ascertain the available jobs in the national economy that fit the claimant's residual functional capacity, age, education, and work experience. In this case, the ALJ determined first that Plaintiff had the residual functional capacity to perform a full range of light work. (Tr. at 34.) Applying the Medical-Vocational grids, she then concluded that there were jobs available in the national economy that suited Plaintiff's needs, thereby rendering him not disabled. (Id. at 35.)

Even if the ALJ had been correct in her determination that Plaintiff is able to perform a full range of light work (which, as explained *infra*, this Court finds was an error), it would nonetheless be the case that the ALJ's sole reliance on the grids was erroneous:

> In the ordinary case the Commissioner meets his burden at the fifth step by resorting to the applicable medical vocational guidelines (the grids). . . . [However], exclusive reliance on the grids is inappropriate where the guidelines fail to describe the full extent of a claimant's physical limitations. . . . In particular, sole reliance on the grids may be precluded where the claimant's exertional impairments are compounded by significant non-exertional impairments that limit the range of sedentary work that the claimant can perform. In these circumstances, the Commissioner must introduce the testimony of a

14

vocational expert (or other similar evidence) that jobs exist in the economy which claimant can obtain and perform.

Butts v. Barnhart, 388 F.3d 377, 383-84 (2d Cir. 2004) (quoting Rosa v. Callahan, 168 F.3d 72,

78 (2d Cir. 1999)). The ALJ acknowledged that the grids are inappropriate for a claimant who

suffers non-exertional limitations, but found that Plaintiff did not suffer from such limitations.

(Tr. at 35.) This finding was made without proper consideration of Plaintiff's testimony

regarding his subjective experience of pain or evidence suggesting that he had "trigger finger,"

as noted by Dr. Burton. (Id. at 106.) These symptoms are in fact considered to be non-

exertional limitations, which are defined by the Second Circuit as limitations "imposed by the

claimant's impairments that affect[] her ability to meet the requirements of jobs other than

strength demands, and include[] manipulative impairments and pain." Rosa at 78 n.2 (quoting

Soboloewski v. Apfel, 985 F. Supp. 300, 310 (E.D.N.Y. 1997)).

     The ALJ chose to discount the credibility of Plaintiff with regard to his subjective

complaints of pain and to reject medical evidence indicating that Plaintiff suffers from non-

exertional limitations. This was an error. That Plaintiff claims to have such limitations requires

the ALJ to rely on evidence outside of the Medical-Vocational grids. Nelson v. Bowen, 882

F.2d 45, 49 (2d Cir. 1989) (overruling exclusive reliance on grids for a claimant whom the ALJ

found capable of performing sedentary work with no non-exertional limitations but who claimed

to be incapable). Accordingly, even if the ALJ correctly found that Plaintiff is capable of

performing a full range of light work, this case requires remand for a consideration of suitable

jobs available in the national economy based on evidence beyond the grids.

     The ALJ did not properly weigh the medical and non-medical evidence in coming to her

conclusion. The ALJ discounted Dr. Burton's assessments because Dr. Burton concluded that

15

Plaintiff had a herniated disc, which the ALJ held contradicted the findings of Dr. Charney, who indicated that Plaintiff had a bulging disk. (Tr. at 104.) However, it is not clear that Dr. Burton's conclusion is necessarily contradictory to Dr. Charney's. (Tr. at 104.) Even if the ALJ were forced to choose between these two reports, more weight should have been given to Dr. Burton's findings because he both reviewed the films and examined the patient on more than one occasion, while Dr. Charney only read the films. Schisler v. Sullivan, 3 F.3d 563 (2d. Cir. 1993) (a treating physician's opinion should be accorded greater weight than that of a non-treating physician). In addition, it is unclear from the medical evidence that the difference between a bulging disc and a herniated disc is significant enough to alter Plaintiff's subjective experience of pain and ability to perform various physical activities. At a minimum, the ALJ should have explained her reasoning regarding this issue.

The ALJ also incorrectly undervalued the opinion of Dr. Lanzone. In Schisler, the Second Circuit explained the treating physician rule: "If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight." Schisler, 3 F.3d at 567. In order for an ALJ not to give controlling weight to a treating physician's opinion, she must cite substantial evidence in support of her decision and must still accord some weight to the treating physician's claims. Id. at 568. The factors an ALJ should consider in making this sort of determination include frequency of contact with the patient and supporting and contradictory evidence. Id. at 567. Increased weight should also be accorded to a specialist. Id.

In this case, even if the ALJ had a proper reason to not give controlling weight to the opinion of Dr. Lanzone, Plaintiff's long-term treating physician, Dr. Lanzone's opinion nonetheless should have been weighted heavily because (1) he saw the patient on several occasions over almost a decade, (2) he is an orthopedic surgeon and therefore a specialist, and (3) his opinion was supported by substantial evidence in the record, including the opinions of other specialists. The ALJ did not provide adequate explanation for the weight she accorded to Dr. Lanzone's conclusions.

The Second Circuit has reversed a finding against a claimant where the treating physician specifically said that the patient was unable to perform any work, even sedentary. See Murdaugh v. Sec'y of Dep't of Health and Human Services, 837 F.2d 99 (2d Cir. 1988). In Murdaugh, the court held that the ALJ could not rule against the treating physician's opinion without substantial evidence to the contrary and that the only contradictory report on the record, which came from the Department of Health and Human Services itself, did not constitute such evidence. Id. at 102.

In this case, only the Board's report indicated that Plaintiff was able to return to work. (Tr. 145.) Moreover, only the Board's report, which was not issued by an ongoing treating source, directly contradicts the opinion of Plaintiff's treating physician, Dr. Lanzone. Thus, the report of the Board does not constitute substantial evidence sufficient to permit an ALJ to ignore Dr. Lanzone's opinions.

It was also unreasonable for the ALJ to rely on the Board's medical findings because she ultimately failed to accept its conclusion that Plaintiff could perform full police duty. After considering other medical sources, and the fact that the NYPD itself refused to return Plaintiff to

17

full-duty work, the ALJ instead concluded that Plaintiff was able to perform only light work. In Curry v. Apfel, the Second Circuit held that an ALJ could not both accept and reject a medical opinion, stating "we see no basis upon which the ALJ could reject Dr. Mancheno's diagnosis while simultaneously relying on his opinion regarding impairment." Curry v. Apfel, 209 F.3d 117, 124 (2d Cir. 2000). In this case, the ALJ erred by simultaneously accepting the Board's diagnosis and rejecting its opinion regarding Plaintiff's impairment.

Additionally, in Murdaugh, the Second Circuit held that an ALJ may not override a treating physician's finding of disability based merely on a claimant's nature and frequency of treatment or evidence that he can perform certain daily activities, such as getting on and off of an examination table, working in his garden, or visiting friends. Murdaugh, 837 F.2d at 102. In other words, "a claimant need not be an invalid to be found disabled under Title XVI of the Social Security Act[.]" Id.

In addition to undervaluing the opinions of Dr. Lanzone, Plaintiff's treating physician, and inappropriately weighing the findings of the Board, the ALJ also improperly characterized Plaintiff's testimony about his daily activities. The ALJ both omitted testimony regarding Plaintiff's ability to lift, sit, or stand continuously, and mischaracterized testimony about Plaintiff's daily routine. The ALJ found that Plaintiff "was able to read, watch t.v. and drive without any unrelenting pain and discomfort." (Id. at 33.) Plaintiff's actual testimony, however, was that he could walk only two blocks, could not sit or stand for more than fifteen minutes continuously, and could not bend or lift at all. (Id. at 252.) Plaintiff further expressed constant discomfort in his daily activities, stating "I don't even watch the whole ball game anymore." (Id. at 256.) In reference to the influence of physical therapy on Plaintiff's condition, the ALJ noted

the therapist's optimistic findings but not Plaintiff's subjective reactions. Plaintiff explained that physical therapy was not productive, as demonstrated by his testimony that immediately following treatment, even the thrust of the elevator going down six floors at a time was too painful to endure. (Id. at 237.)

The Second Circuit has explained that a claimant cannot be found able to perform sedentary work merely because he engages in sedentary activities at home:

> [T]he Commissioner contends that Balsamo "did a lot of reading and watching television, activities which are generally indicative of an ability to sit." We take judicial notice that individuals can read and watch television while lying down and find that these facts do not materially advance the Commissioner's conclusion that Balsamo is able to perform sedentary work. . . . "When a disabled person gamely chooses to endure pain in order to pursue important goals," such as attending church and helping his wife on occasion go shopping for their family, "it would be a shame to hold this endurance against him in determining his benefits unless his conduct truly showed that he is capable of working."

Balsamo v. Chater, 142 F.3d 75, 81-82 (2d Cir. 1998) (quoting Nelson v. Bowen, 882 F.2d 45, 49 (2d. Cir. 1989)).

Just as the ALJ in Balsamo incorrectly relied on evidence that the claimant performed sedentary activities at home to find that he could perform sedentary work, so too did the ALJ in this case incorrectly use Plaintiff's testimony to reach her conclusion regarding his physical abilities. A claimant's disability is not undermined by his taking part in activities such as reading or watching television, both of which can be done lying down. Plaintiff should not be precluded from a finding of disability where he testified that this is exactly what he does.

Furthermore, where a claimant has a strong work history, without prior incident, the ALJ should find that the claimant's credibility is increased. See, e.g., Rivera v. Schweicker, 717 F.2d 719, 725 (2d Cir. 1983). Plaintiff has a twenty-five-year work history with the NYPD, during

which time he was promoted to sergeant and never took sick leave despite several on-duty injuries. (Tr. at 228.) His assertions are entitled to a degree of credence.

Plaintiff's daily activities, his subjective complaints of pain and limitations, his treating physician's conclusions, and the medical evidence on record confirm Plaintiff's inability to perform light work. The ALJ based her contradictory conclusion on parts of the record that fail to demonstrate the full extent of Plaintiff's limitations. Moreover, the ALJ disregarded the fact that the absence of conclusions as to what Plaintiff cannot do does not necessarily inform what he can do. She further discounted Plaintiff's testimony, as well as Dr. Lanzone's and Dr. Burton's testimony, without providing adequate reason for doing so. The only evidence to support the ALJ's finding is the report of the Board, which is inconsistent with the record as a whole.

In Curry, an ALJ found that a claimant was able to perform sedentary work for the purpose of a Step 5 evaluation based solely on the lack of evidence to the contrary. Curry, 209 F.3d at 123. The Second Circuit held this to be a ground for reversal because the burden of proof as to step 5 lies with the Commissioner, not with the claimant, and so a lack of conclusive evidence should yield a finding in the claimant's favor:

> Although the law is well established that the burden of proof shifts to the Commissioner at the fifth step, the ALJ's conclusion that the "record does not establish that the claimant is unable to sit for prolonged periods of time" evinces a disregard for the procedure. Rather than requiring [the claimant] to demonstrate that he cannot sit for extended periods, the law requires the Commissioner to prove that [the claimant] can sit for the requisite number of hours each day.

Id. at 123 n.1. Similarly, the ALJ in this case points to a lack of objective medical evidence as a reason to find Plaintiff not disabled at Step 5. (Tr. at 33.) As in Curry, however, although the record in this case does not prove all of Plaintiff's alleged limitations, it fails to prove that

20

Plaintiff has the ability to perform light work.

### 3. Time Delay

Plaintiff argues that he is entitled to reversal of the ALJ's opinion denying him disability insurance and remand for the calculation of benefits because more than ten years elapsed between his initial application and the Commissioner's final determination. (Pl's Mem. Supp. Mot. J. at 23.) The fact that a claimant has waited an unreasonable amount of time for a Social Security Administration determination on his application for disability benefits does not itself impact the district court's review of the ALJ's conclusion. See, e.g., Butts v. Barnhart, 388 F.3d 377 (2d Cir. 2004). The only consequence of an unreasonable delay is that, should the Administration's final decision substantively warrant remand, it may be appropriate for the court to order that all subsequent adjudication take place within a specified time in light of the protracted delay. Id. In any event, the court need not and does not reach this issue.

### 4. Remand Versus Reversal

Having determined that the ALJ's decision is not supported by substantial evidence, I now must decide whether to remand this case for further proceedings or reverse for calculation of benefits. Remand is appropriate only where there is reason to believe that the Commissioner will later produce evidence to support the ALJ's decision. Curry, 209 F.3d at 124. In Rosa, the Court of Appeals found that remand was appropriate because more evidence was needed to determine whether the claimant met the requirements of a particular residual functional capacity and the court found that such evidence might be available. Rosa, 168 F.3d at 79-80. The claimant testified that there were reports of doctor visits missing from the record. Id. In Balsamo, as in Curry, the court reversed rather than remanded because there was no reason to

believe that the Commissioner could meet the burden of proof on Step 5 upon remand; the court was clear that in order to do so, the Commissioner would have to both introduce new evidence and demonstrate a justifiable reason for not having that evidence made available for consideration at the first hearing. Balsamo, 142 F.3d at 82.

In the instant case, there is no reason to believe the record is incomplete. Because the ALJ collected all relevant medical records from the time period at issue, it is highly unlikely that remand for additional evaluation would provide an opportunity for the Commissioner to support a finding that Plaintiff was capable of performing light work, as she failed to do so in her first decision. Because Plaintiff, within his right, elected not to pursue vigorous medical treatment or surgical intervention for his condition, the medical evaluations during the time period of his disability request are limited. Any further medical opinions would necessarily be retroactive and it is now ten years past the relevant period. The Commissioner has not met her burden of proof at Step 5, and there is no reason to believe that such burden could be met upon remand.

Reversal is proper "[w]hen the record provides persuasive proof of disability and a remand for further evidentiary proceedings would serve no purpose." Parker v. Harris, 626 F.2d 225, 235 (2d Cir. 1980). In the instant case, a remand for further proceedings would not produce any new relevant evidence. There is persuasive evidence that Plaintiff was disabled during the relevant period, and the record establishes that he was not performing substantial gainful activity, had a severe condition, and was unable to return to his past relevant work or any other type of work in the national economy.

### III. Conclusion

For the foregoing reasons, the Commissioner's motion is DENIED and Plaintiff's motion

is GRANTED to the extent that this case is REVERSED and REMANDED to the Social

Security Administration for a calculation of benefits only.

SO ORDERED.

Dated: July 25, 2007
      Brooklyn, N.Y.

/signed/
_____
NICHOLAS G. GARAUFIS
United States District Judge